**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-10207
Summary Calendar
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SHELBY DANIELS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:95-CR-281-G)
_____

January 24, 1997

Before SMITH, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]


Shelby Daniels appeals his conviction of possession of stolen mail and possession of counterfeit securities in violation of 18 U.S.C. §§ 513(a) and 1708. We affirm in part and reverse in part.

_____

 * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The following evidence was presented at trial:  In November 1994, Sue Stretcher responded to an advertisement in the DALLAS MORNING NEWS regarding the repairing of personal credit.  She had poor credit at the time, having run up several credit cards, written "hot" checks, and declared bankruptcy.  She spoke on the telephone to a man who identified himself as Tony Robertson, but who was later identified as Daniels.

Daniels discussed with her the possibility of using a tax identification number as a way to acquire a loan without Stretcher's creditors knowing about it.  He told her that he would give her an address she could use so that the credit history associated with her tax identification number would not be connected to her social security number.  The address, 5942 Abrams Road in Dallas, Texas, was a drop box next to Daniels's apartment to which he had the key.  Daniels also referred Stretcher to a potential lender that he said was not too picky about its borrowers.  Although she made the application with Daniels's advice, the loan was not approved.  Stretcher did not have substantial contact with Daniels again until early March 1995.

At that time, she saw the ad again and called.  This time, Daniels told her to call him Shelby Daniels.  He was working at an organization called Cash for College and said she might be able to get a loan through that firm.  She went to his office and picked up an application for a $7,500 loan.  When she brought it back to his

office, he gave her a new tax identification number to use on it. The loan was tentatively approved over the phone, pending receipt of employment verification. Stretcher sent in one legitimate pay stub and another stub that Daniels had created based on her part-time job. The loan was eventually disapproved.

Daniels then gave Stretcher two counterfeited checks, allegedly drawn by Stewart Title Company from NationsBank, N.A., Dallas, Texas. The first check was made out to "Su Stretcher" for just under $9,000. When Stretcher deposited the check in her account, the bank put a hold on it and then on her account. The second check, which was for $426.86, was made out to Norma Applewhite, whose name had come from a Cash for College application. Daniels gave Stretcher false identification, which she used successfully to cash the check.

Daniels also told Stretcher about a New York company that would print checks for them as though they were a business. Daniels gave her information on business names, banks, account numbers, and routing numbers, which she transmitted to New York. After the checks were mailed to her apartment, she brought them to Daniels's office, where he endorsed them with the computer. The next day, Stretcher deposited them and obtained $7,500.

Shortly thereafter, Jim Dailey of the Dallas Police Department contacted Stretcher. After initially prevaricating, she decided to cooperate, telephoned Daniels, and had a monitored and taped conversation with him. During the conversation, Daniels became

3

upset with Stretcher when she forgot to refer to checks as "envelopes." The two discussed the possibility of getting more checks, for about $500 or $600, and they also discussed a cellular phone bill that needed to be paid or the phone service would be cut off. Daniels and Stretcher were using two phones on the same account, which Stretcher had opened using the Applewhite name. The bill was sent to the drop box at 5942 Abrams.

A week or two after the taped conversation, Stretcher obtained some checks from Daniels. Secret Service Special Agent Cindy Travis, posing as Stretcher's friend, drove her to a car repair shop to meet Daniels. When they met him, he reached under the steering column of his car and retrieved an envelope, which he handed to Stretcher. Stretcher later gave the envelope to Travis. It contained six counterfeited checks made out to Sue Stretcher, ostensibly drawn by Stewart Title Company, on an account with Bank One, Texas, N.A. Three of the checks had the same number.

A few days later, Travis and Stretcher went to Daniels's Cash for College office, where Stretcher gave him an envelope containing $200 in payment for some of the Stewart Title checks that she supposedly had cashed. When Stretcher started talking about the checks, Daniels motioned for her to be quiet because someone was standing outside his office getting coffee. When the individual walked away, Stretcher told Daniels she would pay him for the rest of the checks after she cashed them and asked whether he was opposed to Travis's cashing some of them. He said it was fine with

4

him, but told Travis not to call him if she got arrested unless she had a bailout fund prepared for his use. Travis told Daniels she would call him if she succeeded in cashing any checks.

On a subsequent day, Daniels paged Travis and asked her why she had not yet called him. She told him that she had planned to do so and that she had "taken care of" one of the "items." She promised to meet him and pay for the item and one more that Stretcher supposedly had cashed. Travis went to the Cash for College office and gave him $200 in an envelope, telling him she had no problem cashing the checks.

Travis also told Daniels that she had a credit card and wanted him to check to see whether it had any unused credit on it. Travis informed him that the card was hers but showed him two cards still in their mailers, in the names of Michael Hoffman and Keith Harrison. Daniels swiped them through a machine and told her one had a $5,000 limit. He offered to buy it from her for $500, but she declined. Daniels advised Travis to use it first at a gas station to make sure it would process correctly. He also asked her whether she could get more credit cards.

Daniels and Travis spoke again a few more times, and finally Travis told Daniels she had been successful in finding more "items." She said her source wanted $100 for each of them, and Daniels suggested they try two of them before buying them all. When she brought some cards to his office, he bought three of them and was then arrested.

5

A search of Daniels's office yielded two items found in their original envelopes. Each was addressed to an occupant of 6108 Abrams Road, the same apartment complex in which Daniels lived. Each addressee's mail box was located close to Daniels's mail box. Daniels lived in apartment 323.

One of the envelopes contained a bank statement and was addressed to Michael Kelly, who lived in apartment 321 at the complex during July and August 1995. Kelly suffered from a developmental disability, and Curtis Poole worked for Kelly as a clinical social worker assistant, helping him with independent living, money management, and other skills. One of Poole's duties was to take care of Kelly's financial records, cashing and writing checks, and keeping current files on his bank statements. Poole's job entailed placing all of Kelly's bank statements in a metal box when they were received. He testified that he did not receive the statement in question. The envelope was postmarked on July 27, 1995.

The other item was an account statement for a MasterCard that was addressed to Bonita Coleman, who lived in apartment 409 at the complex. The billing envelope of the statement bore a printed, box legend in the upper right-hand corner of the envelope where a postage is normally placed that read:

```
ZIP + 4
BARCODED
FIRST CLASS
U.S. POSTAGE
PAID
```

Mail Services, Inc. The envelope also bore a computer-generated nine-digit ZIP code below the address window. Coleman testified that she never had received the item, which was a statement from her MasterCard bank and which she had expected to receive in the mail in early August.

## II.

Daniels argues that the evidence is insufficient to support his conviction for possessing counterfeit securities. He contends that the government failed to prove an essential element of the offense, to wit, that the checks he gave Stretcher came from a legal entity that affected interstate or foreign commerce. The government concedes a total lack of evidence on this element and further concedes that the conviction on this count, accordingly, must be reversed.

We appreciate the government's fulfillment of its ethical responsibility in making this concession. Daniels's conviction for violating § 513 is reversed.

## III.

Daniels argues that the evidence is insufficient to support his convictions for possessing stolen mail, because the government did not prove that the bank account and credit card account statements found in his office were actually stolen from the mail.

7

In order to support a conviction for a violation of § 1708, the government must prove that (1) the defendant possessed the item alleged to have been stolen from the mail; (2) the item was stolen from the mail; (3) the defendant knew the item was stolen; and (4) the defendant specifically intended to possess the item unlawfully. *United States v. Dawson*, 608 F.2d 1038, 1039 (5th Cir. 1979). A jury may infer that an item was stolen from the mail if there is evidence of due mailing and nonreceipt.

In support of his argument, Daniels claims that there was no evidence of nonreceipt of the statement.[1] Poole gave the following testimony:

> Q. Sir, with regard to Mr. Kelly's bank statement, what do you do with the bank statements when they come in?
>
> A. What I do with them is when we get them, he has like a metal box in which we put all his bank statements in along with like his checking account, you know, book, things of that nature.
>
> Q. And did you receive this particular statement for Mr. Kelly?
>
> A. No.

Other than Poole's testimony, the government produced no evidence of nonreceipt of Kelly's bank account statement.

Daniels characterizes Poole's testimony as insufficient to

---

[1] The bank account statement was postmarked with a United States Postal Service date demonstrating the date it was mailed. Daniels does not contest that the jury could infer from this evidence that the bank account statement was duly mailed.

demonstrate nonreceipt, stating that the testimony did not show the item was not received in the mail, because Poole never testified that he collected Kelly's mail from Kelly's mailbox, and the mail could have been intercepted after Kelly removed it from the mailbox. Daniels interprets the testimony as demonstrating that Poole filed bank account statements only after Kelly received them in the mail.

Daniels relies upon *Dawson* to support his theory. In *Dawson*, the stolen money orders were addressed to a drug store, and the only evidence of nonreceipt was the manager's testimony that mail was generally delivered to the cashier who gave it to either the manager or the pharmacist or placed it on the manager's desk. It was undisputed that the money orders were not logged into the store's accounts. *Dawson*, 608 F.2d at 1039. The court stated that

> because the evidence did not show that mail is logged in immediately upon receipt from the mail carrier, non-logging cannot be equated with nonreceipt. The only inference the jury could draw was that the items were stolen sometime between the time they were mailed and when they would have been logged in; there was no evidence from which a jury could reasonably rule out the hypothesis of a theft after receipt by the drug store.

Daniels's reliance on *Dawson* is misplaced. Poole answered in the negative when asked whether he had "received this particular statement *for* Mr. Kelly." (Emphasis added.) The jury could infer from this testimony that Poole gathered mail for Kelly and that Poole's failure to "receive" the bank account statement meant a failure to receive it from the mail. The facts of this case are

9

not analogous to those in *Dawson*. *Dawson* also uses the hypothesis-of-innocence test for sufficiency of the evidence that was overruled in *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356 (1983). So, with all reasonable inferences drawn in favor of the verdict, there was sufficient evidence for the jury to find that the bank account statement was stolen from the mail. *U.S. v. Vasquez*, 953 F.2d 176, 181 (5th Cir.), <u>cert. denied</u>, 504 U.S. 946 (1992).

IV.

Daniels contends that the government failed to prove that the credit card statement was stolen from the mail, as there was no evidence of due mailing.[2] The following exchange occurred on Daniels's cross-examination of Travis:

Q. You don't know who handled this mail, do you?

A. I know the U.S. mail handler. I did verify that.

Q. We know the U.S. mail handler had it at some point or mishandled it somehow. We know that also, don't we?

A. We know they handled it.[3]

Daniels discounts Travis's testimony, contending that it was

---

[2] To demonstrate nonreceipt of the credit card statement, the government presented Coleman, the addressee of the statement, who testified that she expected the item in the mail but never received it. Daniels does not dispute that this is valid evidence of nonreceipt.

[3] Although the testimony is rather ambiguous regarding whether the mail handled by the mail handler included both the bank account and credit card account statements or just one of the statements, Daniels admits on appeal that the testimony referred to both statements.

hearsay and was more likely her opinion that the bank account and credit-card account statements had been mailed. We do not consider this argument, because it is raised for the first time in Daniels's reply brief. *See United States v. Prince*, 868 F.2d 1379, 1386 (5th Cir.), *cert. denied*, 493 U.S. 932 (1989).

With all reasonable inferences drawn in favor of the verdict, we conclude that the jury had sufficient evidence to infer that the credit card account statement had been duly mailed and to find that the statement was stolen from the mail. *See Vasquez*, 953 F.2d at 181.

The judgment of conviction is AFFIRMED in part and REVERSED in part.